UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CHERYL KRIST,                                     :
                                                  :
                        *Plaintiff,*              :
                                                  :
        -against-                                 :      17-cv-01312 (PAC)
                                                  :
BETH ISRAEL MEDICAL CENTER, *et al.*              :      **OPINION & ORDER**
                                                  :
                        *Defendants.*             :
-------------------------------------------------------------X

Plaintiff Cheryl Krist ("Plaintiff") brings this action against Mount Sinai Beth Israel

("MSBI") and Mount Sinai Hospital ("MSH," and together with MSBI, "Defendants") for

unlawful discrimination on the basis of her disability. Seeking both injunctive and monetary relief,

she asserts causes of action based on Title III of the Americans with Disabilities Act, 42 U.S.C.

§ 12101 *et seq.* ("ADA"), Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Rehabilitation Act"), New

York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the New York

City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq.* ("NYCHRL").

Defendants move for summary judgment on all counts. For the reasons set forth below,

the Court **GRANTS** Defendants' motion with respect to Plaintiff's ADA and Rehabilitation Act

claims and declines to exercise supplemental jurisdiction over the NYSHRL and NYCHRL claims.

## BACKGROUND

### a. Factual Background

Unless otherwise indicated, the following facts are undisputed.[1] Defendants are two

member hospitals of the Mount Sinai Health System. Def.'s Mot. Summ. J. 1, ECF No. 86.

Plaintiff suffers from several progressive neurological and orthopedic conditions for which she

---

[1] Citations to the parties' motions, memoranda, and Local Rule 56.1 filings incorporate those documents' citations to the underlying documents in the record.

seeks treatment at Defendants' facilities. Pl. Depo. Tr. 23, ECF No. 96-1; J. Krist Depo. Tr. 47, ECF No. 96-2. Since 2008, she has been assisted by a service dog who accompanies Plaintiff to medical appointments and aids her with a variety of other tasks. Pl. Depo. Tr. 23, 26. Both animals that have served in this capacity—first Bocci, who passed away in or around 2017, and then Beau—have been properly trained and registered with the United States Service Dog Registry and Service Dog Registration of America. *Id.* at 26, 28–29. When visiting Defendants' facilities, Plaintiff's service dog wears a service jacket and tags reflecting these registrations. *Id.* at 27, 30. Plaintiff's husband, Joseph Krist, also accompanies her to many health appointments. *Id.* at 41.

For their part, MSBI and MSH have adopted nearly identical written policies that prohibit discrimination based a patient's use of a service animal. In relevant part, these policies read:

> Individuals with disabilities accompanied by service animals shall be allowed in all areas of the [facility]. . . .
>
> When it is not obvious what service an animal provides, only limited inquiries are allowed. Staff may ask if the dog is a service animal required because of a disability and what work or task the dog has been trained to perform. . . .
>
> Staff may not ask about the person's disability, require medical documentation, require a special identification card or training documentation for the [animal], or ask that the [animal] demonstrate its ability to perform the work or task. . . .
>
> A person with a disability cannot be asked to remove his service animal from the premises unless (a) the dog is out of control and the handler does not take effective action to control it within a reasonable amount of time or (b) the dog is not housebroken. . . .
>
> In the event someone in the area of the service animal has asthma, allergies to the animal, or a phobia about animals, the [facility] shall modify its policies, practices, and procedures to permit a service animal to remain with a patient by, for example, moving the patient to another comparable room, changing staff schedules, or using other nondiscriminatory methods. . . .
>
> [The facility] shall instruct and train all medical personnel and staff, including security personnel, on the provisions of this policy upon hire and annually.

MSBI Policy No. 2024G, ECF No. 101-2; MSH Policy 7.12, ECF No. 102-1.[2]  Pursuant to its

Assisted Pet Therapy Program, which allows volunteers to bring pets into the facility, MSBI has

enacted an additional policy.  Resnick Depo. Tr. 62–63, ECF No. 135-1.  MSBI Policy 203, which

is not shared by MSH, provides:

> Persons attempting to enter the hospital premises with animals must be questioned
> as to their business in the hospital.  Once it has been determined that their visit is
> appropriate, and authorized according to hospital policy, they are to be asked if
> their animal is a pet.  If they claim the animal is a service animal, they are to be
> allowed to enter without having to identify their disability or provide proof that the
> animal is a service animal. . . .
>
> Persons and animals that are a part of the hospital Assisted Pet Therapy Program,
> will be authorized by the Volunteer Department, who will arrange for hospital ID.

MSBI Policy 203, ECF No. 101-1.  Defendants train their staff regarding these policies.  This

training begins during new employees' onboarding, and typically continues at least annually

throughout each employees' tenure.  Rubinstein Depo. Tr. 25–26, 46–47, ECF No. 116-4.  During

the pendency of this action, Defendants have taken additional steps to update and enhance their

training procedures.  *Id.* at 59–63; Arenas Depo. Tr. 41–43, ECF No. 98-2.

MSBI and MSH patients who wish to file complaints may avail themselves of Defendants'

grievance processes, which is overseen by Mount Sinai's centralized Patient Service Center.

Rubenstein Depo. Tr. 52–53.  Patients are apprised of this option in several ways, including written

notice, signs posted at Defendants' facilities, and resources available online.  *Id.* at 82–83.

---

[2] Both policies outline certain narrow exceptions, including for areas of the facility where a "sterile environment is maintained," or where an "individualized assessment made by the physicians, nurses or other licensed health care providers with the ADA Coordinator based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence" that the service animal poses a "risk to health and safety."  *See* MSBI Policy No. 2024G; MSH Policy 7.12.

### b. **Plaintiffs' Medical Visits**

Plaintiff's lawsuit stems from a series of visits to Defendants' facilities in which she claims she was discriminated against due to her use of a service dog.

First, on April 15, 2016, Plaintiff sought treatment for migraine headaches from Dr. Huma Sheikh, a neurologist at MSBI. Defs.' Rule 56.1 Statement ("Defs. 56.1") ¶ 27, ECF No. 137. This was the first and only time Plaintiff visited Dr. Sheikh; Plaintiff's regular neurologist was unavailable and asked Dr. Sheikh to provide an opinion on Plaintiff's condition and prospective treatment options. Pl. Depo. Tr. 63; Sheikh Depo. Tr. 33–34. Plaintiff ultimately disagreed with Dr. Sheikh's opinion that Plaintiff's excessive use of daily pain medication was contributing to her migraine issues, as well as Dr. Sheikh's treatment recommendations and neurological testing practices. Defs. 56.1 at ¶ 36. Accordingly, Plaintiff did not return to Dr. Sheikh after this visit; she now sees a neurologist associated with a different hospital group. Pl. Depo. Tr. 24.

The parties dispute whether Plaintiff was allowed to bring her service dog into the treatment room during her visit with Dr. Sheikh. Plaintiff and Mr. Krist have each testified that Dr. Sheikh refused to see Plaintiff unless the dog remained in the waiting room with Mr. Krist. Pl. Depo. Tr. at 22–24; J. Krist Depo. Tr. at 49–50. According to Plaintiff, Dr. Sheikh stated, "I'm allergic." Pl. Depo. Tr. at 54–55. Dr. Sheikh claims the service dog was, in fact, present throughout the visit. Sheikh Depo. Tr. 57–59. Further, her undisputed testimony indicates that she treats about four patients with service animals each year, that she asks no questions of these patients regarding their service animals, that she is not allergic to dogs, and that she has never[3]

---

[3] Plaintiff disputes this testimony only insofar as it relates to Plaintiff's April 15, 2016 visit. There is no evidence in the record contradicting this statement other than Plaintiff's and Mr. Krist's testimony regarding that specific visit.

4

declined to treat a patient accompanied by a service animal, nor requested a service animal's removal. Defs. 56.1 at ¶¶ 32, 40.

Plaintiff has testified that after her visit with Dr. Sheikh, she attempted without success to call and then to text message a number for a cell phone or landline she believed belonged to MSBI's head of neurology. Pl. Depo. Tr. 83–87. She also claims to have spoken in-person with another doctor concerning her visit with Dr. Sheikh, but her account of that conversation includes no service animal discussion. *Id.* at 87. Plaintiff does not claim that she ever complained of service animal discrimination directly to Dr. Sheikh.

On June 8, 2016, Plaintiff, accompanied by her husband and service dog, visited the Emergency Room at MSH after injuring her knee in a fall at her home. Pl. Depo. Tr. 90–91. Upon arrival, MSH security guards asked Plaintiff to wait for at least five minutes in the entrance with her service dog before placing her in a wheelchair and bringing her into the facility. *Id.* at 63; J. Krist Depo. Tr. 22. Plaintiff has further testified that "[t]he security guard wanted me to tie the dog out to the tree outside." Pl. Depo. Tr. 66. Once inside, she claims an unidentified triage nurse told her to "keep that thing away from me" and another staff member wearing scrubs remarked that "you don't really need that dog because you're not blind." *Id.* at 63–64. She recalls hospital staff moving her within the facility multiple times "because I was in the way and nobody wanted to have the dog anywhere near them." *Id.* at 93. At one point, Mr. Krist took the service dog outside to relieve itself and one of the security guards now on duty initially "didn't want to let [Mr. Krist] bring [the dog] back in." *Id.* Plaintiff recalls complaining in the moment to MCH staff about how she was being treated. *Id.* at 101. Apart from her time in the x-ray room—where, for safety reasons, service animals are not allowed—Plaintiff was permitted to keep her service dog with her at all times. J. Krist Depo. Tr. 25–26. All told, hospital records indicate the visit lasted

just under three hours and that Plaintiff was treated 30 minutes after seeing the triage nurse upon her arrival inside the Emergency Room. Pl. Depo. Tr. 95–96. Plaintiff has testified that "they wanted me out of there so fast." *Id.* at 102.

The following year, on October 4, 2017, Plaintiff visited Dr. Susan Boolbol at one of Defendants' facilities to have her blood drawn. Defs. 56.1 at ¶ 50. During the visit, one of Dr. Boolbol's nurses told Plaintiff that she "didn't want the dog there" because of her fear of dogs. Pl. Depo. Tr. 17, 106. Plaintiff assured the nurse that the dog was "not going to do anything to you." *Id.* at 106. Plaintiff was allowed to keep the dog with her throughout her visit, and in response to the first nurse's concerns, Dr. Boolbol's office arranged for a different nurse to draw Plaintiff's blood. *Id.* at 107; J. Krist Depo. Tr. 72–73. According to Plaintiff, Dr. Boolbol later "apologized and told the nurse that she shouldn't do that." Pl. Depo. Tr. 18. Plaintiff has continued to visit Dr. Boolbol twice a year without any further incident involving her nurses. *Id.* at 41–42, 112.

Two months later, on December 8, 2017, on her way to an MRI appointment at one of Defendants' facilities, Plaintiff was stopped by a security guard who told her that she "couldn't come in with the dog." Pl. Depo. Tr 16. The guard incorrectly stated that it was the facility's policy that Plaintiff could not enter with her service animal without "papers" for the dog. *Id.* at 16, 113. Plaintiff has testified that she responded, "I'm not showing you any papers" and "[y]ou're not allowed to ask," and that she then "kept right on going" into the building. *Id.* at 113. Upon being informed by his supervisors that he had misunderstood the service animal policy, the security guard immediately attempted to apologize to Plaintiff. *Id.* at 113–114; J. Krist Depo. Tr. 45–46. Unable to find Plaintiff, who by then was mid-treatment, he instead apologized to her husband, who refused to accept, telling the security guard, "you need to talk to [Plaintiff]." Pl. Depo. Tr. 113–14, J. Krist Depo. Tr. 46. When Plaintiff and her husband returned to the front desk area, that

6

security guard was no longer there. Pl. Depo. Tr. 114. Plaintiff continues to see the physician who ordered the December 8, 2017 MRI every three months. *Id.* at 44, 112.

Plaintiff has also testified as to other instances in which she has hassled by security personnel at Defendants' facilities. "Four, five, six times a year they would get really under my skin" by telling Plaintiff her service animal is "the wrong breed," "not a service dog," or "the wrong size," by telling her she "can't bring a dog in," or by asking her for service animal "papers." Pl. Depo. Tr. 48, 52, 74. On one occasion, she had to call up to the office manager who then intervened, allowing Plaintiff to enter with her service animal. *Id.* at 48. On all such occasions, Plaintiff has been allowed entry to be treated in Defendant's facilities with her service animal. *Id.* at 90–91, 107, 113. Plaintiff continues to frequent Defendants' facilities. Defs. 56.1 at ¶ 20.

### c. Procedural Background

This is the sixth lawsuit Plaintiff has brought against a public accommodation since 2008 alleging discrimination based on her use of a service animal. Defs. 56.1 at ¶ 71. With one exception, Plaintiff settled each of the prior actions. *Id.* at ¶ 72. The only non-settled action resulted in a bench trial verdict against Plaintiff, which was later affirmed on appeal. *See Krist v. Kolombos Rest. Inc.*, 688 F.3d 89 (2d Cir. 2012).

Plaintiff filed this lawsuit in early 2017 seeking both injunctive and monetary relief. *See* ECF No. 1. After answering Plaintiff's Complaint and then her Amended Complaint, Defendants moved for Summary Judgment in December 2019. *See* ECF No. 83. Plaintiff then requested, and the Court granted, leave to conduct additional depositions and to file supplemental briefing. *See* Pl.'s Supp. Memo. 3, ECF No. 134

In December 2020, after undertaking this additional discovery, Plaintiff sought leave to amend her complaint again to include a new allegation that Plaintiff was discriminated against at

one of Defendants' facilities on September 21, 2020. *See* ECF No. 126. The Court deferred this request pending its summary judgment ruling. *See* Dec. 23, 2020 Conf. Tr. 13–14, ECF No. 132. The parties have not exchanged discovery regarding this additional incident; the only factual material pertaining to it is contained in Plaintiff's declaration to the Court. *See* Pl. Decl., ECF No. 136. According to this brief submission, during her September 21, 2020 visit to one of Defendants' facilities, Plaintiff claims she was "forced to leave my service animal in the waiting room with my husband." *Id.* She neither specifies how this message was conveyed to her nor claims to have requested that her service animal be allowed to accompany her into the treatment room. *Id.*

## DISCUSSION

### I. Legal Standards

#### a. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Thus, "a scintilla of evidence in support of the plaintiff's position will be insufficient [to defeat a motion for summary judgment]." *Id.* at 252. "[T]he substantive law . . . identif[ies] which facts are material," and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly prelude the entry of summary judgment." *Id.* at 248. "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal quotation marks and citations omitted).

At the summary judgment stage, the Court "construe[s] all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). Because credibility determination is the province of a jury, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010); *see also Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008) ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory. . . ."). Nor may a party rely only on the "mere allegations or denials of his pleading." *Anderson*, 477 U.S. at 248 (1986). Rather, the party opposing summary judgment "must proffer admissible evidence that sets forth specific facts showing a genuinely disputed factual issue that is material under the applicable legal principles." *Major League Baseball Props.* 542 F.3d at 310 (cleaned up).

### b. Article III Standing

"[T]he irreducible constitutional minimum of standing [in federal court] contains three elements," each of which are a plaintiff's burden to establish. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). To satisfy this burden, a plaintiff must show (1) "injury in fact" that is both "concrete and particularized" and "actual or imminent, not conjectural or hypothetical;" (2) "a causal connection between the injury and the conduct complained of" such that the injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court;" and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 560. When seeking injunctive

relief must, a plaintiff must show that "the identified injury in fact presents a 'real and immediate threat of future injury'" if the requested injunctive relief is not granted. *Dominguez v. Banana Republic, LLC*, No. 19-cv-10171 (GHW), 2020 WL 1950496, at *2 (S.D.N.Y. Apr. 23, 2020) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). "Past exposure to illegal conduct . . . unaccompanied by any continuing, present adverse effects" cannot establish Article III standing for purposes of injunctive relief. *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974).

Because these elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "At the summary judgment stage—the current posture of this action—Plaintiff must demonstrate standing through specific facts via affidavits or other evidence." *Bellino v. JPMorgan Chase Bank, N.A.*, 209 F. Supp. 3d 601, 604 (S.D.N.Y. 2016).

Article III's standing requirements apply in full force to ADA and Rehabilitation Act claims. *See Ortiz v. Westchester Med. Ctr. Health Care Corp.*, No. 15-cv-5432 (NSR), 2016 WL 6901314, at *5 (S.D.N.Y. Nov. 18, 2016) ("Although the ADA generously confers the right to be free from disability-based discrimination, Congress cannot abrogate the Art. III minima . . . .") (cleaned up). Where injunctive relief is sought, a past ADA or Rehabilitation Act violation cannot, on its own, establish standing; rather, "[a] plaintiff must allege a future encounter with the defendant which is likely to lead to a similar violation of some protected right." *Freydel v. New York Hosp.*, 242 F.3d 365 (2d Cir. 2000) (unpublished). Accordingly, in the Second Circuit, a plaintiff seeking injunctive relief under the ADA may establish standing by showing: (1) past injury under the ADA; (2) that it is "reasonable to infer that the discriminatory treatment [will] continue" absent relief; and (3) that it is "reasonable to infer . . . that plaintiff intends to return" to

the relevant location, or that she has been deterred from returning by the unlawful behavior at issue. *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187–88 (2d Cir. 2013).

### c. Applicable Law

"The ADA prohibits discrimination against the disabled in major areas of life." *Lopez v. Heritage of Pride, Inc.*, No. 19-cv-6065 (CM), 2019 WL 6529317, at *3 (S.D.N.Y. Dec. 3, 2019). Because the ADA and Section 504 of the Rehabilitation Act impose effectively "identical requirements," courts typically consider claims brought under both statutes in tandem. *Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999); *see also Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) ("[U]nless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically.").[4]

Title III of the ADA, 42 U.S.C. § 12181–89,[5] prohibits discrimination in access to public accommodations. *See PGA Tour, Inc. v. Martin,* 532 U.S. 661, 675–76 (2001). Under Title III, a plaintiff must show that "(1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA."[6] *Roberts v. Royal Atlantic Corp.,* 542 F.3d 363, 368 (2d Cir. 2008), *cert. denied,* 556 U.S. 1104 (2009). "A hospital illegally discriminates under the [ADA] if it fails to make reasonable accommodations for a person with a service animal." *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1083 (N.D. Cal. 2013).

---

[4] These subtle distinctions do not apply in this case. *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 146 n.6 (2d Cir. 2002) ("Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded—as opposed to 'public'—entities, the reach and requirements of both statutes are precisely the same.").

[5] "A private individual may only obtain injunctive relief for violations of a right granted under Title III [of the ADA]; [she] cannot recover damages." *Powell v. Nat'l Bd. of Med. Examiners*, 364 F.3d 79, 86 (2d Cir.), *opinion corrected,* 511 F.3d 238 (2d Cir. 2004).

[6] The parties agree that the first two factors are satisfied here, leaving only the discrimination element in dispute.

Courts in this Circuit look to regulations promulgated by the Department of Justice to determine whether a public accommodation has taken sufficient steps to prevent discrimination. *See, e.g., Roberts*, 542 F.3d at 369; *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008). These regulations contain provisions pertaining to service animals. As relevant here, "[a] public accommodation shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an animal qualifies as a service animal." 28 C.F.R. § 36.302(c)(6). It may ask (1) "if the animal is required because of a disability" and (2) "what work or task the animal has been trained to perform," but it may not request documentation or other proof of the animal's certification, training, or license. *Id.* It must then allow, with limited exceptions, the service animal to accompany the person "in all areas of a place of public accommodation where members of the public, program participants, clients, customers, patrons, or invitees, as relevant, are allowed to go." 28 C.F.R. § 36.302(c)(7). Finally, it must modify its "policies, practice, or procedures" to comply with these regulations. 28 C.F.R. § 36.302(c)(1).

## II.  Article III Standing Analysis

Plaintiff's Article III standing claims are grounded in two distinct theories. First, she argues that Defendants have enacted policies that are *per se* unlawful under the ADA, and that she is therefore subject to a "real and immediate threat of future injury." *Dominguez*, 2020 WL 1950496, at *2. Second, she argues that even if the policies are not unlawful, Defendants have subjected her to an ongoing pattern of harm cognizable under the ADA and Rehabilitation Act sufficient to demonstrate an imminent threat of future harm. *See id.* Because the evidence fails to substantiate either theory, Plaintiff has failed to establish Article III standing.

### a. The Policies

Plaintiff first argues that Defendants' policies regarding animals at their facilities, on their face, violate the ADA. Specifically, she argues that MSBI's Policy 203 unlawfully exceeds the limited inquiries as to service animals permitted under 28 C.F.R. § 36.302(c)(6).

The Court disagrees. As a preliminary matter, it notes that Defendants' primary service animal policies, which are substantially identical to one another, comply with the ADA. Both the MSBI and MSH policies, as quoted herein, adequately reflect the regulatory guidance set forth in 28 C.F.R. § 36.302(c). Plaintiff does not argue otherwise.

Instead, Plaintiff takes aim at Policy 203, which provides that persons entering MSBI are "to be asked if their animal is a pet" and, if so, authorizes further steps for "[p]ersons and animals that are a part of the hospital Assisted Pet Therapy Program." MSBI Policy 203. Because, Plaintiff argues, hospitals "may ask only two questions of service animal handlers," by directing staff to make an inquiry pertaining to animals presented at Defendants' facilities that is not specifically enumerated in the regulations, MSBI Policy 203 is *per se* unlawful. Pl.'s Supp. Memo. 12.

But this argument both selectively reads and distorts the regulations, which in full provide:

> A public accommodation shall not ask about the nature or extent of a person's disability, but may make two inquiries to determine whether an animal qualifies as a service animal. A public accommodation may ask if the animal is required because of a disability and what work or task the animal has been trained to perform. A public accommodation shall not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal. Generally, a public accommodation may not make these inquiries about a service animal when it is readily apparent that an animal is trained to do work or perform tasks for an individual with a disability . . . .

28 C.F.R. § 36.302(c)(6). Read in context, it is plain that the regulations do not seek to forbid hospitals from asking *any* questions other than the two Plaintiff has identified as proper. Instead, they foreclose attempts to ascertain whether a service dog purported to be a service dog is in fact

a service dog, or whether a patient purporting to require the assistance of a service dog in fact requires the assistance of a service dog. Plaintiff does not cite, nor has the Court found, any authority suggesting that the regulations forbid healthcare providers from asking other questions relevant to legitimate treatment offerings. *Cf. O'Connor v. Scottsdale Healthcare Corp.*, 871 F. Supp. 2d 900, 901, 904 (D. Ariz. 2012) (granting hospital's motion to dismiss even though its security guard had asked a patient "when [her service animal] was last groomed and vaccinated").

Plaintiff's winks and nods that Policy 203 is effectively a loophole allowing MSBI to impermissibly probe patients' service animal needs are entirely without evidentiary foundation. *See* Pl.'s Supp. Reply Memo. 4–5, ECF No. 141. Not only does the policy aid MSBI in administering a legitimate treatment offering—its pet therapy program—but it specifically provides, in lockstep with 28 C.F.R. § 36.302, that if a person with an animal "claim[s] the animal is a service animal, they are to be allowed to enter *without having to identify their disability or provide proof that the animal is a service animal.*" MSBI Policy 203 (emphasis added). The Court thus declines Plaintiff's invitation to repurpose the ADA as a means for courts to Monday-morning quarterback legitimate hospital services. *See West v. Moe's Franchisor, LLC*, No. 15-cv-2846 (WHP), 2015 WL 8484567, at *3 (S.D.N.Y. Dec. 9, 2015) ("Reasonable businesses, aided by counsel, could navigate through all of the ADA's relevant regulations and never reach the conclusion that [defendants' accommodations] violate federal law. And given the labyrinth of city, state, and federal regulations, it is not appropriate for this Court to announce new ones.").

Thus, to the extent Plaintiff's bid for Article III standing relies upon any purported ongoing injury stemming from Policy 203, it must fail.

**b. Pattern of Discrimination**

Plaintiff has also failed to demonstrate an ongoing pattern of harm cognizable under the ADA and Rehabilitation Act sufficient to establish Article III standing.

Plaintiff complains of four specific instances of purported discrimination by Defendants' staff, and alludes to other similar, unspecified episodes of unpleasantness. Even assuming that all the underlying testimony is true, only one such incident, Plaintiff's April 2016 visit with Dr. Sheikh, arguably constitutes unlawful behavior under the ADA. Plaintiff has testified that Dr. Sheikh refused to treat Plaintiff until her service dog was removed to the waiting room because of an allergy. Although the Court emphasizes that Plaintiff does not claim to have been denied treatment, nor to have received subpar treatment due to her wish to be accompanied by her service animal, it recognizes that such a refusal may nonetheless be proscribed under the ADA. *See Camarillo*, 518 F.3d at 157 (holding that a Title III violation can occur even where the plaintiff "was never denied service"); *see also* 28 C.F.R. § Pt. 36, App. A ("[A] healthcare facility must . . . permit a person with a disability to be accompanied by a service animal in all areas of the facility in which that person would otherwise be allowed.").[7]

The other incidents Plaintiff cites—including her June 2016 emergency room visit, October 2017 visit with Dr. Boolbol, and December 2017 MRI visit—fail amount to anything more than unactionable hassle or slight delay.[8] As the Second Circuit held in one of Plaintiff's previous

---

[7] Because the ADA, of course, serves to protect people, not their animals, from discrimination, the relevant inquiry would be whether Plaintiff was denied a "full and equal opportunity to enjoy the services defendants provide." *Camarillo*, 518 F.3d at 156. As the Court grants Defendant's motion on other grounds, it assumes without deciding that Plaintiff's account of the Dr. Sheikh visit would amount to an ADA and Rehabilitation Act violation.

[8] Plaintiff has attempted to tack on another alleged incident of discrimination after the close of discovery. *See* Pl. Decl. The Court declines to include this incident within the body of evidence to consider at summary judgment. *See* Fed. R. Civ. P. 56(c)(3). The Court denied Plaintiff's motion to amend her complaint to include this incident after discovery had formally closed, and the parties have therefore taken no discovery regarding this claim. Moreover, even if the Court were to consider the conclusory, unsupported, and unelaborated assertion that Plaintiff was "forced" on September 21, 2020 (*see* Pl. Decl.) to receive treatment in the absence of her service animal, it would fail to disrupt the Court's conclusion that Plaintiff has failed to establish standing. *Bellino*, 209 F. Supp. 3d at

lawsuits, "the ADA does not impose a civility code." *Krist*, 688 F.3d at 97; *see also Camarillo*, 518 F.3d at 157 ("[T]he ADA cannot regulate individuals' conduct so as to ensure that they will never be rude or insensitive to persons with disabilities.") (internal quotation marks and citations omitted). In that case, the Second Circuit affirmed a bench verdict in favor of the defendant restaurant where staff, *inter alia*, "all became very cool," expressed "skepticism" about the legitimacy of her service animal, "made growling sounds" at the dog, "shouted at" Plaintiff, "stopped speaking" to her, and "hoped she would leave and not return" after she began bringing her service animal. *Krist*, 688 F.3d at 91–97 (cleaned up). And just as before, Plaintiff's latest unpleasant and unfortunate interactions—although "rude and insensitive"—do not implicate the ADA. *Id.* at 93 (internal quotation marks and citations omitted). Aside from the Dr. Sheikh visit, Plaintiff was permitted to keep her service dog with her at all times, except during procedures where service animals are not allowed due to undisputedly valid safety reasons (i.e., x-rays, CAT scans). *See* 28 C.F.R. § 36.302(a). At no point was Plaintiff, by virtue of her service animal, substantially delayed from receiving treatment at one of Defendants' facilities. *Cf. Stephens v. Shuttle Assocs., L.L.C.*, 547 F. Supp. 2d 269, 277–78 (S.D.N.Y. 2008) (bus delay of 40 minutes not sufficient for ADA violation). Nor has Plaintiff advanced any proof that her medical treatment suffered due to her service dog's presence. At worst, aside from the Dr. Sheikh visit, Plaintiff's evidence suggests that some of Defendants' employees made rude or insensitive comments about her service dog—at least two of which were quickly corrected by supervisors. *Cf. Stan v. Wal-Mart Stores, Inc.*, 111 F. Supp. 2d 119, 126 (N.D.N.Y. 2000) (noting that plaintiff "should not be

---

604 ("At the summary judgment stage . . . Plaintiff must demonstrate standing through *specific* facts via affidavits or other evidence.") (emphasis added); *see also Major League Baseball Props.*, 542 F.3d at 319 (finding a "vague and conclusory" statement insufficient to create a genuine dispute of material fact); *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 736 (2d Cir. 2010) (holding that materials not submitted to the court until after summary judgment motions had been filed failed to create a genuine dispute of material fact).

subject to lengthy interrogation regarding her service dog," but granting summary judgment because plaintiff was allowed to access the public accommodation "with management's apologies for the inappropriate treatment she received from the greeters"); *see also Doe v. U.S. Sec'y of Transportation*, No. 17-cv-7868 (CS), 2018 WL 6411277, at *9 (S.D.N.Y. Dec. 4, 2018) (observing that discovery in ADA cases can reveal "isolated acts of negligence which do not come within the ambit of discrimination against persons with disabilities") (cleaned up).

Stripped of these unactionable encounters, Plaintiff's lawsuit seeks injunctive relief based on a single violation: her visit to Dr. Sheikh. But even assuming Plaintiff's account of that visit is accurate, one infraction does not create a "a pattern of repeated conduct." *Stephens*, 547 F. Supp. 2d at 278 (distinguishing *Camarillo*, 518 F.3d at 157, which held that an ADA plaintiff had standing where defendants had made "more than one or two isolated mistakes"). Plaintiff no longer sees Dr. Sheikh, and the undisputed evidence suggests that this is because she disagreed with Dr. Sheikh's medical recommendations and testing procedures, and because Dr. Sheikh was not her regular physician to begin with—not because of her service animal. Thus, Plaintiff has failed to show, as is her burden, that she either "intend[s] to return" to see Dr. Sheikh or that she has been "deterred" from doing so due to unlawful conduct. *Kreisler*, 731 F.3d at 187–88 (requiring at least one of these elements to establish standing); *see also Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329, 1333–34 (N.D. Cal. 1994) (no standing where plaintiff "has shown neither that she is likely to use the hospital in the near future, nor that defendants are likely to discriminate against her when she does"). To be sure, Plaintiff does intend to return to Defendants' facilities to see *other* practitioners. But because she has failed to demonstrate any other actionable violations, her "mere speculation" that she may be subject to future harm even without returning to Dr. Sheikh

is insufficient for Article III standing purposes. *Schroedel v. New York Univ. Med. Ctr.*, 885 F. Supp. 594, 599 (S.D.N.Y. 1995).

In sum, because she has failed to show either the presence of an unlawful policy, or a pattern of ongoing actionable harm, Plaintiff has failed to establish the prospect of "real and immediate threat of repeated injury" necessary for Article III standing. *Kreisler*, 731 F.3d at 188.

## III.    Plaintiff's Claim for Monetary Damages

A plaintiff who lacks standing to seek injunctive relief may nonetheless pursue a claim for monetary relief under the Rehabilitation Act. *See Romano v. SLS Residential Inc.*, 246 F.R.D. 432, 440 (S.D.N.Y. 2007). However, although "a plaintiff aggrieved by a violation of the Rehabilitation Act may seek monetary damages," they "are recoverable only upon a showing of an intentional violation." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) (cleaned up). The standard for intentionality under the Rehabilitation Act is a defendant's "deliberate indifference," defined as a "deliberate choice, rather than negligence or bureaucratic inaction." *K.A. v. City of New York*, 413 F. Supp. 3d 282, 304 (S.D.N.Y. 2019); *see also Viera v. City of New York*, No. 15-cv-5430 (PGG), 2018 WL 4762257, at *13 (S.D.N.Y. Sept. 30, 2018) ("Deliberate indifference plainly requires more than gross negligence and requires that the indifference be a deliberate choice, which is an exacting standard.") (cleaned up). Deliberate indifference occurs where: "(1) an official or policymaker who—at a minimum—has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf, (2) has actual knowledge of discrimination against an individual with a disability, and (3) fails to adequately respond." *Viera*, 2018 WL 4762257, at *13.

Here, Plaintiff has made no such showing. Although, as set forth above, Plaintiff has presented evidence of one potential Rehabilitation Act violation, the evidence fails to establish that

it stemmed from anything more pernicious than, at worst, Defendants' unactionable "mere negligence." *Viera*, 2018 WL 4762257, at *10. As the Court has already addressed, Defendants' policies pertaining to service animals are lawful.  Defendants enforce these policies, train their staff regarding these policies, provide their patients with avenues to report grievances, and continually make efforts to further improve these processes.  Evidence of occasional staff missteps is scant, and evidence of the hospital deliberately ignoring those few missteps is nonexistent. Plaintiff does not claim to have ever submitted a formal complaint regarding any alleged discrimination, much less that Defendants ignored any such complaint.  At most, Plaintiff has testified that following the Dr. Sheikh visit, she tried in vain to call and then to text message a cell phone or landline she believed belonged to MSBI's head of neurology.  She also claims to have spoken with another doctor concerning her visit with Dr. Sheikh, but provides no details of that conversation that pertain to her service animal.

In sum, Plaintiff fails to demonstrate that any authorized policymakers had "actual knowledge" of any reported discrimination, much less that they "failed to respond adequately." *Viera*, 2018 WL 4762257, at *13, 15 (internal quotation marks and citations omitted).[9] To the contrary, her evidence depicts behavior falling well short that which courts in this Circuit have found to be deliberately indifferent. *See, e.g., Loeffler*, 582 F.3d at 274–76 (finding a genuine issue of material fact as to deliberate indifference where evidence suggested a hospital ignored and in one case "laughed off" patients' "constant requests" for an ALS interpreter in spite of the hospital's policy to provide one upon request); *Biondo v. Kaledia Health*, 935 F.3d 68, 71 (2d Cir.

---

[9] Plaintiff's evidence of complaints regarding incidents that the Court has herein held unactionable is similarly lacking.  During the June 8, 2016 emergency room visit, she claims to have told unspecified staff that "what they were doing was wrong" and that "they can't give somebody crappy treatment when they have a service dog." Pl. Depo. Tr. 101.  She has also testified that "five or six years ago" she called the general counsel's office to complain that she was "having a problem with service dogs," but cannot confirm whom she spoke with—"I just called the general counsel's office and spoke to whoever I got." *Id.* at 50–51.

2019) (finding a genuine issue of material fact as to deliberate indifference where evidence suggested a patient who had been born deaf "kept requesting an interpreter" and hospital staff "kept saying, 'we will, we will, we will'" but never provided one), *cert. denied sub nom. Kaleida Health v. Biondo*, 140 S. Ct. 956 (2020).

Thus, Plaintiff's claim for monetary damages under the Rehabilitation Act also fails.

## IV.    NYSHRL and NYCHRL Claims

District courts have jurisdiction over state-law claims that are "so related to claims in the action within [the district court's] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). A district court may decline to exercise supplemental jurisdiction over a state-law claim where, *inter alia*, it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). Thus, because the Court grants Defendants' motion for summary judgment with respect to Plaintiff's ADA and Rehabilitation Act claims, the Court declines to exercise supplemental jurisdiction over her NYSHRL and NYCHRL claims.

## CONCLUSION

The Court therefore grants Defendants' motion for summary judgment as to Plaintiff's ADA and Rehabilitation Act claims.  Plaintiff's claims under the NYSHRL and NYCHRL are dismissed without prejudice.  The Clerk of Court is directed to close this case.

Dated: New York, New York                    SO ORDERED
       September 28, 2021

                                       HONORABLE PAUL A. CROTTY
                                       United States District Judge